OPINION OF THE COURT
Alice Schlesinger, J.
The issue before the court is whether the City of New York in its capacity as landlord is like any other landlord subject to the requirement of keeping its buildings in good repair pursuant to section 78 of the Multiple Dwelling Law and section 27-2005 of the Housing Maintenance Code (Administrative Code of City of NY, tit 27, ch 2).
In September 1991 the Lacks plaintiffs moved by order to show cause to stay their landlord, the City, from evicting them from their homes located at 18 Schaffer Street, in the Bushwick section of Brooklyn. The eviction proceedings were brought by the City because it had posted a vacate order in July 1990 which alleged pursuant to section 26-301 (1) (e) of the Administrative Code of the City of New York (the Administrative Code) that the building was unsafe.
The Lacks plaintiffs maintain that the building is not in the condition as alleged by the City. Further, plaintiffs state the present condition of the building is a result of the City’s failure to repair the building as required by the Multiple Dwelling Law and the Housing Maintenance Code. Therefore, the City should not be permitted to vacate the building but rather must repair it.
The 428 St. Nicholas Avenue plaintiffs live in four adjoining buildings in Harlem. The buildings are owned by the City as well. These plaintiffs commenced their lawsuit seeking declaratory and injunctive relief and damages. As in the Lacks matter, the predicate to the action was the issuance of vacate orders based on the alleged existence of conditions that endangered the health and safety of the tenants residing in the buildings.
In both actions, the City acquired the buildings through in rem foreclosure actions.
Plaintiffs’ application is grounded on a simple declaration found in Multiple Dwelling Law § 78 (1). It states as follows: “Every multiple dwelling, including its roof or roofs, and every part thereof and the lot upon which it is situated, shall *751 be kept in good repair. The owner shall be responsible for compliance with the provisions of this section.”
Similarly, Housing Maintenance Code § 27-2005 (a) states: "The owner of a multiple dwelling shall keep the premises in good repair.”
In sum, plaintiffs assert that the Legislature intended to bind the City in its capacity as an owner of residential multiple dwellings to comply with the Multiple Dwelling Law and the Housing Maintenance Code and that this duty is not necessarily discharged by issuance of a vacate order.
The City’s response is that section 26-301 (1) (e) of the Administrative Code gives it discretionary authority to either close unsafe buildings or expend monies to repair them.[1]
The City reconciles the Multiple Dwelling Law, the Housing Maintenance Code and the Administrative Code by arguing that the issuance of the vacate orders terminates the general duty to keep a multiple dwelling in good repair.
Defendants’ construction cannot be harmonized and is unpersuasive. Section 26-301 (1) (e) of the Administrative Code does not state that a vacate order terminates the City’s obligation to keep a building in good repair. The failure of the Legislature to include a matter within the scope of a statute is an indication that the exclusion was intended (Pajak v Pajak, 56 NY2d 394, 397 [1982]; McKinney’s Cons Laws of NY, Book 1, Statutes § 74).
It is well settled that the warranty of habitability applies to the City of New York. In City of New York v Rodriguez (117 Misc 2d 986 [App Term, 1st Dept 1983]) the court noted that the Legislature had at times specifically exempted city-owned property from remedial tenant legislation. It deemed signifi *752 cant the failure of the Legislature to grant city-owned property an exemption from Real Property Law § 235-b.
This holding was subsequently approved by the Appellate Division in Department of Hous. Preservation & Dev. v Sartor (109 AD2d 665, 666-667 [1st Dept 1985]). "It is clear from the unequivocal language of the statute, and the broad application of its protective mantle by the cases which have applied it, that section 235-b excludes no residential tenant and includes all persons and entities as 'landlords’.” (Supra, at 666-667.)
The court recognizes the general rule that an agency’s construction of a statute or regulation that it is charged with enforcing will be upheld provided it is not irrational or unreasonable (Matter of Lower Manhattan Loft Tenants v New York City Loft Bd., 104 AD2d 223, 224, affd 66 NY2d 298). However, as the Appellate Division recently stated: "This rule presupposes * * * that 'no constitutional or statutory mandate is violated’ * * * the court need not accord weight to an agency’s statutory interpretation that is in clear violation of the terms of enablement * * * Moreover, a remedial statute is to be liberally construed * * * In short, it is unnecessary to defer to an agency’s narrow interpretation of a statute when a broad mandate expressed in the clear language of the statute is contravened” (Matter of Polkabla v Commission for Blind & Visually Handicapped of N. Y. State Dept. of Social Servs., 183 AD2d 575, 576-577 [1st Dept 1992]).
To suggest that the duty to repair extinguishes upon placement of the vacate order or that it applies only to private owners as distinguished from the City, a nonprofit entity, would not accomplish the purpose behind passage of the Multiple Dwelling Law and Housing Maintenance Code.
In promulgating the Multiple Dwelling Law the Legislature recognized that establishing and maintaining proper housing standards was essential to the health, safety, and public welfare (see, Multiple Dwelling Law § 2).
Similarly, in passing the Housing Maintenance Code the City Counsel stated that "[t]he purpose of the proposed legislation is to protect the people of the City of New York against the consequences of urban blight by providing for the establishment of minimum standard of health, safety, fire protection, light and ventilation, cleanliness, repair and maintenance, and occupancy in dwellings.” (Report of Comm on Bldgs, June 22,1967, at 1720.)
Furthermore, the legislative declaration to Housing Mainte *753 nance Code §27-2002 provides specifically that the Code is intended:
”1. to preserve decent housing;
"2. to prevent adequate or salvageable housing from deteriorating to the point where it can no longer be reclaimed; and
"3. to bring about the basic decencies and minimal standards of healthful living in already deteriorated dwelling, which, although no longer salvageable, must serve as habitations until they can be replaced * * *
"In order to accomplish these purposes * * * it is hereby found that the enactment of a comprehensive code of standards for decent housing maintenance, imposing duties and responsibilities for the preservation of the dwellings in the city upon owners and tenants, as well as on the municipality itself * * * is appropriate for the protection of the health, safety and welfare of the people of the city.”
Thus, the Legislature was not concerned with the profit motive of a landlord. Rather, the purpose of the legislation was to protect all tenants, not just those tenants living in private, for-profit housing.
The City states that it presently owns 5,000 in rem buildings that contain approximately 50,000 occupied housing units, with close to 130,000 tenants. These buildings are according to the City among the worst of the City’s housing stock. To hold that these tenants’ rights to safe and decent housing cease merely upon issuance of a vacate order will create two classes of tenants. The first class of tenants will be statutorily entitled to decent and safe housing. The second class will possess these rights only to the point when a bureaucratic decision is reached directing them to leave their homes. Such a holding would result in reducing the housing stock and frustrate the Legislature’s intent to preserve adequate or salvageable housing.
The City argues that to compel it to repair in rem housing usurps Department of Housing Preservation and Development’s discretionary authority to determine when buildings are unsafe and when monies should be expended on building repairs. However, the position that this controversy is therefore nonjusticiable is not convincing.
There is no question that the City has the authority to make a discretionary determination pursuant to section 26-301 (1) (e) of the Administrative Code that a building is unsafe because it endangers the life, health or safety of the occupants and must be vacated. However, the City’s discretion is not *754 without limits.[2] Multiple Dwelling Law § 78 and Housing Maintenance Code § 27-2005 mandate that an owner is responsible for keeping multiple dwellings in good repair. Since the court finds it is this statutory duty that the City must discharge, the controversy is justiciable (Jiggetts v Grinker, 75 NY2d 411 [1990]).
Additionally, the City maintains that the issue of whether it permitted the buildings to languish in a state of disrepair creating the need to issue the vacate orders is not relevant because the City does not profit from vacating the building.
Courts have required private landlords to repair buildings over the landlord’s objection of economic feasibility reasoning that a landlord should not be permitted to profit by emptying a building and failing to discharge a statutory duty (see, Commissioner of Dept. of Hous. Preservation & Dev. v 69 W. 38th St, NYLJ, Aug. 5, 1987, at 11, col 1 [App Term, 1st Dept]; Department of Hous. Preservation & Dev. v St. Thomas Equities, 128 Misc 2d 645 [App Term, 2d Dept 1985]). The underlying rationale of these cases is that a wrongdoer will not be permitted to profit from his or her illegal conduct. "Equity requires that a party seeking relief in our courts must come with 'clean hands.’ ” (Department of Hous. Preservation & Dev. v St. Thomas Equities, supra, at 651.)
Thus, to the extent the City seeks to be relieved from its statutory duty to repair the buildings, it must demonstrate that its conduct did not create the condition of disrepair in the first place or allow such a condition to occur from neglect. In other words the City must show that it has clean hands.
In view of the above, plaintiffs’ motion for partial summary judgment is granted to the extent of declaring that Multiple Dwelling Law § 78 and Housing Maintenance Code § 27-2005 are applicable and binding upon the City of New York and that despite the posting of vacate orders the City is under a continuing statutory obligation to keep its in rem buildings in good repair.
In view of the above, the matter is set down for a hearing on the plaintiffs’ application for a preliminary injunction. Consistent with the September 17, 1991 order granting a temporary restraining order, the court finds that there are *755 factual disputes on the following issues: (1) whether the conditions of the subject buildings are in such a state that they endanger the life, health and safety of the occupants; (2) whether the cost of repairs necessary to bring the buildings into compliance with the Multiple Dwelling Law and the Housing Maintenance Code are so unreasonable so as to discharge the City from its duty of repair; and (3) whether the City disregarded its statutory obligations by permitting the buildings to lapse into their current state of disrepair.
[Portions of opinion omitted for purposes of publication.]

. Section 26-301 (1) (e) of the Administrative Code places upon the Commissioner of the Department of Housing Preservation and Development the following duty:
"To review conditions of city-owned dwellings used for residential purposes and, upon submission of a report by two qualified employees of the agency following a personal inspection, setting forth a finding that any such dwelling is in condition which endangers the life, health or safety of the occupants, and if he or she accepts such report, the commissioner may certify that the conditions in the dwelling are such that they require that the dwelling be vacated in which event he or she shall:
"(i) order such dwelling to be vacated by its occupant upon no less than thirty days written notice to such occupants; and
"(ii) provide relocation services and allowances for occupants who relocate pursuant to any such order.”

. In this regard it should be noted that although the City’s position is that section 26-301 (1) (e) gives it a basis to close in rem buildings for fiscal reasons, the regulation itself does not state that the decision to issue a vacate order may take into consideration the cost of repair.